**Opinion issued April 8, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00308-CR

————————————

**JOSE FELICIANO CASANOVA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 25th District Court**
**Colorado County, Texas**
**Trial Court Case No. 21-153**

---

## MEMORANDUM OPINION

A jury found Jose Feliciano Casanova guilty of felony murder for his role in a drive-by shooting that caused the death of Keaton Hancock.[1] The trial court assessed Casanova's punishment at confinement for life.

---

[1] *See* TEX. PENAL CODE §§ 12.32, 19.02(b)(3), (c), 22.05(b)(2).

In his sole issue on appeal, Casanova contends that the evidence is legally insufficient to establish his identity as the shooter or as a party to the offense.

We affirm the trial court's judgment.

## Background

*Prior to the Murder*

On September 8, 2021, two days prior to the murder at issue in this case, Eagle Lake Police Department ("ELPD") officers responded to a report of gunfire at the residence of Hector and Heather Flores on North Walnut Street in Eagle Lake, Texas.

ELPD Officer D. Weatherall testified that numerous people were at the scene when he arrived—including Heather's brother, Casanova, who was living at the house, and Heather's son, Ethan Dulaney. According to Casanova, he and others were in the front yard when Daegan Mendoza, Dontrae Johnson, and Dante Stevens arrived. Daegan and Dontrae, who thought Casanova had "stole[n] some dope," approached the house with AR-15 rifles. As Daegan and Dontrae began firing at the house, Casanova "took off running."

There were no injuries, but the gunshots caused property damage. Daegan's parents came to the scene, and a heated argument ensued with Casanova—requiring officers to physically restrain him.

ELPD Officer G. Ocot also testified that "a lot of people on the scene were very, very angry and upset," and he noted that Casanova threatened to retaliate.

2

At 10:30 p.m. the next night, September 9, 2021, Officer Ocot conducted a traffic stop on an older-model, silver Infiniti sedan with a paper license tag. The car was driven by Casanova's nephew, Ethan, and registered to Andrew Segura. During the stop, Officer Ocot heard gunshots coming from the vicinity of the Eagle Lake Funeral Home—located behind the Flores residence—and went to investigate.

At the funeral home, Officer Ocot observed window damage and spent casings. He circled the block and saw Casanova, Hector, and Cairo Ruvalcaba, Jr., standing outside the Flores residence. They told Ocot that someone had been shooting at them and that one of the shooters from the day before had posted online a photo of himself at the funeral home. Officer Ocot testified that Casanova and Cairo were "very upset and angry." Casanova had a "long barrel rifle slung across his neck," and he again threatened to retaliate, stating, "They're dead, bro."

### *The Murder*

Less than four hours later, the murder at issue in this case occurred. Dante's cousin, Keaton, was shot and killed on the front porch of his house on Martin Luther King Street in Columbus, Texas.

Keaton's mother, Kelly Venghaus, testified that Keaton had gone out to the porch to smoke a cigarette. After Kelly and her husband heard a "loud thump," Kelly opened the front door and saw Keaton deceased on the front porch. Kelly

3

noted that Keaton was very close with his cousin Dante and that Dante had spent considerable time at their house.

Ashleigh Bidales, a neighbor on Martin Luther King Street, testified that, at approximately 2:05 a.m., she was headed outside to smoke a cigarette when she heard gunshots. She looked outside and "heard a [car] engine picking up speed." She then saw a four-door, silver-gray car pass her house at "faster than a normal speed" and run a stop sign. She called Keaton's brother and then called Dante.

Dr. J. Dierksen of the Travis County Medical Examiner's Office testified that Keaton's death was caused by two gunshot wounds to his head and neck.

### The Events After Keaton's Murder and the Investigation

One hour and 40 minutes after Keaton's murder in Columbus, another murder occurred back in Eagle Lake—at the home of Shelly Casanova[2] and her sons, Andrew and Jonathon Segura. Officer Ocot testified that he arrived at the scene shortly after 3:45 a.m. and that, minutes later, Cairo and Casanova's brother, Charlie—who is Jonathon's step-father—arrived. Andrew was on the front porch holding Jonathon, who had gunshot wounds. Andrew explained that Jonathon was sleeping on a couch near the front door when men kicked in the door and began shooting. Andrew fired back, and Jonathon died on the porch. Columbus Police

---

[2]     It appears from the record that Shelly is Casanova's sister-in-law.

4

Department ("CPD") Captain W. Alley opined that Jonathon's murder appeared to be related to, or in retaliation for, Keaton's murder.

CPD Officer C. Mayfield testified that "several" bullet fragments were recovered at the scene of Keaton's murder. No shell casings were found. He testified that the lack of casings suggested that the "shooter was more than likely in a vehicle." And CPD Officer K. Daniel testified that the numerous bullet holes in Keaton's house indicated that the weapon was fired "from a moving object, across a wide range," going west to east, "like a drive-by shooting."

Based on an anonymous tip, Captain Alley viewed surveillance video taken at a Buc-ee's store in Eagle Lake on the night of the murder. The trial court admitted videos and still photographs into evidence. These show a silver, four-door Infiniti with a paper license tag driven up to a gas pump at 1:37 a.m. Captain Alley testified that Ethan is shown driving, Casanova is shown in the front passenger seat, and Cairo is shown in the back seat. Casanova, who bears distinctive facial tattoos, is shown entering the store at 1:38 a.m. And the Infiniti left the store parking lot at 1:41 a.m.

Captain Alley further testified that surveillance video from the Farris Hotel in Eagle Lake shows a silver-gray, four-door vehicle coming from the direction of Buc-ee's and turning north onto FM 102 towards Columbus. The trial court admitted the video into evidence. Captain Alley noted that the distance between the Buc-ee's

5

in Eagle Lake and Keaton's residence in Columbus was about 18 miles and that the drive would take about 23 minutes.

The trial court also admitted surveillance video of Keaton's house, taken on the night of the murder from the school campus across the street. The video depicts a light-colored car turning under a streetlight onto the street in front of Keaton's house at 2:05 a.m. The car slows in front of Keaton's house and quick flashes of light—"several bursts of muzzle flash," according to Captain Alley— emanate from its passenger side before driving away.

Captain Alley opined: "The Infiniti four-door vehicle that's on the Buc-ee's video is the same vehicle that's in the Farris Hotel video" and "the same vehicle that's in the [school] video." She testified that the videos show an older model, silver-gray, four-door sedan with similar hood and trunk lines, low profile tires, fog lights under the headlights, "quarter panel side lights," and "rear quarter panel lights." And the shots were fired from the passenger side of the vehicle, where Casanova was shown riding in the Buc-ee's video, with Cairo behind him.

Two weeks after the murder, Casanova, Ethan, and Cairo were arrested in Sinton, Texas. United States Marshals Service Deputy C. Marrero testified that surveillance was set up on a house in Sinton and that a car matching the Infiniti was seen at the house. Ethan and Cairo were arrested while leaving the house, and four cell phones and a handgun were recovered from the car. Casanova was found hiding

6

from law enforcement four houses away, where he falsely posed as a member of the homeowner's family.

Colorado County Attorney's Office Investigator M. Mayfield testified that one of the cell phones recovered, a rose gold iPhone, showed that, nine days after the shooting, Casanova sent a series of text messages trying to sell the Infiniti and trade his gun. The trial court admitted the extracted cell phone data into evidence. The messages include a "selfie" photograph of Casanova with the Infiniti in the background sent to "Jo Jo Girl" and, ten minutes later, messages with "Og," in which the sender identified himself as Casanova. Casanova then sent photos of the Infiniti, a description of its condition, and an offer to sell it to Og for $2,000.00. Og replied that a family member was interested. Casanova replied: "Thanks and I may have to get rid of my gun to gun [sic]." Og asked "What you gonna want for the gun[?]" Casanova asked for an address, and Og complied.

Texas Department of Public Safety Ranger C. Rogers interviewed Casanova after his arrest. Casanova was upset with ELPD because he believed that "they were not doing their job to protect them during this time frame with this group of people that they had issues with." Casanova admitted that, after the shooting near the funeral home, he and others were "attempt[ing] to get out of town" and stopped at Buc-ee's for gas and cigarettes. He asserted that they then went to see his brother, Charlie Casanova, at his house in Eagle Lake. He denied having gone to Columbus.

7

Ranger Rogers and Captain Alley noted that Charlie lived on Willis Street, south of the Eagle Lake Buc-ee's, but the surveillance video showed the Infiniti heading north toward Columbus. Ranger Rogers opined that, based on his investigation, "the video from the Buc-ee's and the video from the [school]; it's the same vehicle."

The trial court's charge authorized the jury to convict Casanova for the death of Keaton Hancock as a principal actor, a party, or a co-conspirator. It instructed the jury to consider whether Casanova, or a co-actor (Ethan or Cairo), while in the course of committing deadly conduct (discharging a firearm at or in the direction of a habitation), committed an act clearly dangerous to human life (discharging a firearm at an individual—Keaton) that caused Keaton's death. The jury returned a general verdict finding Casanova guilty of felony murder.

## Sufficiency of the Evidence

In his sole issue, Casanova contends that the evidence is legally insufficient to support his conviction because it does not establish that he was "at the scene when the shooting occurred" or that he was "responsible for the shooting" of Keaton.

### A. *Standard of Review and Legal Principles*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In assessing the legal sufficiency of the evidence under the *Jackson* standard, "we consider all of the evidence in the light

8

most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 318–19).

In conducting our review, we defer to the responsibility of the factfinder to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson*, 443 U.S. at 318–19). We therefore "may not re-evaluate the weight and credibility" of the evidence or "substitute our judgment for that of the fact-finder." *Id.* The jury, as the sole judge of the facts and credibility of the witnesses, may choose to believe or disbelieve any witness or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). If the cumulative force of all the incriminating circumstances is sufficient to support the

9

conviction, each fact need not point directly and independently to guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

"The key question is whether the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (internal quotations omitted). And our role on appeal is "restricted to guarding against the rare occurrence when a fact finder does not act rationally." *Id.* (internal quotations omitted).

**B.**     ***Felony Murder***

Felony murder is, "an unintentional murder committed in the course of committing a felony." *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014) (internal quotations omitted). A person commits the offense of felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, . . . the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(3). "[F]iring a gun in the direction of an individual is an act clearly dangerous to human life." *Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999).

The felony murder doctrine "dispenses with the necessity of proving [the] mens rea accompanying the homicide itself; the underlying felony supplies the culpable mental state." *Johnson v. State*, 4 S.W.3d 254, 255 (Tex. Crim. App. 1999).

10

Here, the underlying felony offense is deadly conduct.[3]  A person commits felony deadly conduct if he "knowingly discharges a firearm at or in the direction of . . . a habitation . . . and is reckless as to whether the habitation . . . is occupied." TEX. PENAL CODE § 22.05(b)(2), (e).

## C.     *Discussion*

Casanova argues that the evidence is legally insufficient to support his conviction because it does not identify him as Keaton's shooter.[4]  He does not challenge the sufficiency of the evidence supporting his conviction generally or supporting the other elements of the offense—that felony deadly conduct (discharge of a firearm at or in the direction of a habitation with recklessness as to whether it

---

[3]     "[A] conviction for felony murder . . . will not lie when the underlying felony is manslaughter or a lesser included offense of manslaughter." *Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999).  "[F]elony deadly conduct [is] not a lesser-included offense of manslaughter." *Washington v. State*, 417 S.W.3d 713, 721–22 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("[I]t appears well established under Texas law that deadly conduct can be the underlying felony for felony murder." (internal quotations omitted)).

[4]     Because we conclude below that the evidence is legally sufficient to support the jury's verdict against Casanova as a principal actor, we do not reach the evidence to support his conviction as a party or co-conspirator. When a trial court's charge authorizes a jury to convict a defendant under more than one theory, as it did in this case, the verdict of guilt will be upheld if the evidence is sufficient to support any theory authorized by the trial court's charge. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *see also Leza v. State*, 351 S.W.3d 344, 357 (Tex. Crim. App. 2011) (jury unanimity with respect to guilt as principal actor or party not required); *Covington v. State*, No. 06-15-00190-CR, 2016 WL 2997121, at *2 (Tex. App.—Texarkana May 25, 2016, pet. ref'd) (mem. op., not designated for publication) (jury must be unanimous that defendant committed offense but need not be unanimous as to theory of responsibility).

11

was occupied) was committed and that, while in the course of and in furtherance of such deadly conduct, an act clearly dangerous to human life (discharge of a firearm at or near an individual) was committed that caused Keaton's death. *See* TEX. PENAL CODE §§ 19.02(b)(3), 22.05(b)(2). Accordingly, we limit our review to the essential element of identity. *See* TEX. R. APP. P. 47.1.[5]

Identity may be proven by direct or circumstantial evidence, or by reasonable inferences from the evidence. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018). The evidence must establish that the accused is the person who committed the offense. *Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). "[E]yewitness identification is not necessary." *Id*.

Casanova argues that "the State only proved that [he] was seen in a silver Infiniti at the Eagle Lake Buc-ee's about 30 minutes before the shooting occurred" and that the video from the hotel and school are not clear enough to establish that it is the same vehicle or that he was in the vehicle. We disagree.

---

[5] *See also English v. State*, No. 01-20-00139-CR, 2021 WL 4202159, at *3 (Tex. App.—Houston [1st Dist.] Sept. 16, 2021, no pet.) (mem. op., not designated for publication); *Ostrander v. State*, No. 14-20-00286-CR, 2021 WL 2470390, at *7 (Tex. App.—Houston [14th Dist.] June 17, 2021, pet. ref'd) (mem. op., not designated for publication) ("Because appellant has challenged the proof relating to just a single element of both offenses, we limit our review accordingly."); *see, e.g.*, *Burks v. State*, No. PD-0992-15, 2017 WL 3443982, at *1 (Tex. Crim. App. June 28, 2017) (not designated for publication) (holding that reviewing court should not address unbriefed elements in legal sufficiency challenge).

12

The video evidence, coupled with the circumstantial evidence of the events before, during, and after the commission of the offense, supports the jury's determination that the vehicle from which the shots were fired is the Infiniti in which Casanova was riding and that Casanova was Keaton's shooter.

Before the shooting, Casanova was in a heated feud with Dante, Daegan, and Dontrae. Believing that Casanova had stolen drugs, Dante, Daegan, and Dontrae came to Casanova's residence to retaliate. There, Daegan and Dontrae opened fire with AR-15 rifles in the front yard at Casanova and his friends and family—including Casanova's nephew, Ethan. There was testimony that "a lot of people on the scene were very, very angry and upset." And, later at the scene, law enforcement restrained Casanova when he ran at Daegan's parents. Casanova voiced to law enforcement that he intended to retaliate.

At 10:30 p.m. the next night, Officer Ocot conducted a traffic stop on the Infiniti—an older-model, silver, sedan with a paper license tag. The Infiniti was driven by Ethan and registered to Andrew.

During the stop, gunfire ensued nearby at the funeral home behind Casanova's residence. Officer Ocot saw Casanova, Cairo, and others standing outside the residence, and they said that someone had been shooting at them. Casanova said that one of the shooters from the day before—Dante, Daegan, or Dontrae—had posted online a photo of himself at the funeral home. Casanova and Cairo were

13

"very upset and angry." Casanova was also upset with ELPD because he believed that "they were not doing their job to protect them during this time frame with this group of people that they had issues with." Casanova had a "long barrel rifle slung across his neck" and again stated to law enforcement that he intended to retaliate, stating: "They're dead, bro."

Three hours later, at 1:37 a.m., the Eagle Lake Buc-ee's surveillance video shows the Infiniti— a silver, four-door with a paper license tag—driven up to a gas pump by Ethan, with Casanova in the front passenger seat and Cairo in the back seat. Casanova entered the store at 1:38 a.m., and the Infiniti left the store at 1:41 a.m.

Surveillance video from the Farris Hotel in Eagle Lake then shows a silver sedan passing by the hotel. There was testimony that the Infiniti was coming from the direction of Buc-ee's and turned north onto FM 102 towards Columbus. And there was testimony that the drive from the Buc-ee's in Eagle Lake to Keaton's residence in Columbus was about 18 miles and took about 23 minutes to travel.

Twenty-four minutes later, at 2:05 a.m., surveillance video from the school campus shows a light-colored car turning under a streetlight onto the street in front of Keaton's house. The car slows in front of Keaton's house and quick flashes of light—"several bursts of muzzle flash," according to Captain Alley— emanate from its passenger side before it swiftly drives away.

14

The jury saw the video evidence and could compare the likeness of the vehicles shown. The jury also heard Captain Alley's testimony that the videos show an older model, silver-gray, four-door sedan with similar hood and trunk lines, low profile tires, fog lights under the headlights, "quarter panel side lights," and "rear quarter panel lights." And Captain Alley opined: "The Infiniti four-door vehicle that's on the Buc-ee's video is the same vehicle that's in the Farris Hotel video" and "the same vehicle that's in the [school] video." Ranger Rogers also opined that, based on his investigation, "the video from the Buc-ee's and the video from the [school]; it's the same vehicle." The jury also heard Bidales's testimony that she saw a four-door, silver-gray car leaving the scene.

Based on the evidence, the jury could have reasonably inferred that the shots that killed Keaton were fired from the Infiniti. *See Isassi*, 330 S.W.3d at 638 (we defer to responsibility of factfinder "to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts" and "may not re-evaluate the weight and credibility" of the evidence or "substitute our judgment for that of the fact-finder").[6]

---

[6] *See also Alexander v. State*, No. 01-09-00630-CR, 2010 WL 5187678, at *3 (Tex. App.—Houston [1st Dist.] Dec. 23, 2010, pet. ref'd) (mem. op., not designated for publication ) (jury reasonably concluded that car depicted in surveillance video was that of defendant); *Greene v. State*, 124 S.W.3d 789, 792–93 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (evidence that car fleeing scene matched that which appellant was seen driving on day of offense constituted circumstantial evidence of identity).

In addition, based on the temporal evidence—that the drive from Buc-ee's to Keaton's house generally took 23 minutes and that the shooting occurred on the school surveillance video 24 minutes after the Infiniti left Buc-ee's—the jury could have reasonably inferred that the Infiniti traveled directly from Buc-ee's to Keaton's house. *See Ingerson*, 559 S.W.3d at 509 (identity may be proven by circumstantial evidence or by reasonable inferences from evidence).

Casanova admitted that, after the shooting near the funeral home, he and others were "attempt[ing] to get out of town" and stopped at Buc-ee's for gas and cigarettes. Casanova stated that they then went to his brother Charlie's house. Ranger Rogers testified, however, that Charlie lived on Willis Street—south of Buc-ee's—but that the video evidence shows the Infiniti headed north toward Columbus. "[I]mplausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Guevara*, 152 S.W.3d at 50. And we "presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt*, 368 S.W.3d at 525–26.

With respect to the identity of the shooter, the evidence shows a history of acrimony, threats, and retaliation between Casanova and Dante, Daegan, and Dontrae. And, less than four hours before Keaton was shot and killed, Casanova was very angry and threatened to retaliate against Dante's group by killing someone—saying, "They're dead, bro." *See Gardner v. State*, 306 S.W.3d 274, 286

16

(Tex. Crim. App. 2009) ("increasing ire" and threats constituted inculpatory circumstantial evidence of appellant's identity as shooter); *Greene*, 124 S.W.3d at 792 (acrimonious history and threats constituted circumstantial evidence of identity).[7] Notably, Casanova voiced his threat to law enforcement, while wearing a firearm around his neck. There was also testimony that Keaton was very close with his cousin Dante and that Dante spent considerable time at Keaton's house. And the video evidence showed Casanova in the passenger seat of the Infiniti when it left Buc-ee's at 1:41 a.m. and gunfire emanating from the passenger side of the car in front of Keaton's house 22 minutes later.

Further, nine days after the shooting, Casanova sent text messages trying to sell the Infiniti—which the evidence shows was registered to Andrew—and also tried to "get rid of" his gun. "Attempts to conceal incriminating evidence . . . are probative of wrongful conduct and are also circumstances of guilt." *See Guevara*, 152 S.W.3d at 50.

Two weeks after the shooting, Casanova, Ethan, and Cairo were arrested in Sinton—some two hours away from Eagle Lake. Ethan and Cairo were arrested in the Infiniti, and Casanova was found hiding at a house, where he attempted to deceive law enforcement by falsely posing as the homeowner's family member.

---

[7]     *See also Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) ("Although motive and opportunity are not elements of [an offense] and are not sufficient to prove identity, they are circumstances indicative of guilt.").

Evidence of flight is a "circumstance from which an inference of guilt may be drawn." *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994).

Based on the cumulative force of all the incriminating circumstances, viewed in the light most favorable to the verdict, we conclude that a rational juror could have found beyond a reasonable doubt that Casanova was Keaton's shooter. *See Jackson*, 443 U.S. at 318–19; *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13. "This was not a determination so outrageous that no rational trier of fact could agree." *Merritt*, 368 S.W.3d at 527 (internal quotations omitted); *see Morgan*, 501 S.W.3d at 89 (our role on appeal is "restricted to guarding against the rare occurrence when a fact finder does not act rationally"). Casanova does not challenge the other elements of the offense. *See* TEX. PENAL CODE §§ 19.02(b)(3), 22.05(b)(2). We thus hold that the evidence is legally sufficient to support Casanova's conviction for the offense of felony murder.

We overrule Casanova's sole issue.

## Conclusion

We affirm the trial court's judgment.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).

18